## THE STATE OF TEXAS V. SALVADOR CARDINAS.

1. STATUTE CONSTRUED.—The "act to ascertain or adjudicate claims for land against the State, situated between the Nueces and Rio Grande rivers," (Paschal's Dig., art. 7068, &c.,) requiring that the claimant shall accompany his petition (seeking to establish such claim) "with the titles, or evidences of titles, or right under which the same is held or claimed," is complied with by filing secondary evidence with the petition when the original cannot be procured.

2. SECONDARY EVIDENCE.—A copy of a copy is not admissible in evidence, nor is a copy made and duly authenticated by an alcalde in 1828, of a title of land exhibited to him and not forming part of the archives of his office, entitled to any standing as evidence.

3. SAME—ARCHIVE.—Generally, it is the fact that a document is a record or archive of an office that makes a copy, certified to by the legal custodian of such record or archive, stand in the place of such original, where it is shown to be lost or cannot be produced.

4. EXAMINED COPY.—See testimony held insufficient to establish a document produced as a copy of an original archive, of which it purports to be a copy.

5. FOREIGN JUDGMENTS.—Foreign judgments should be authenticated (1) by an exemplification under the great seal, (2) a copy proved to be correct, (3) the certificate of an officer authorized by law, which itself must be properly authenticated, although, if these modes of proof be beyond reach, other testimony inferior in its nature might be received. But where there is no cause shown for not resorting to the regular mode of proof, it is incompetent to prove by parol the existence and purport of such record of foreign judgment.

6. TESTIMONIO.—When a testimonio, which is an original copy issued contemporaneously with the making of the protocol, and is the evidence of title given to the grantee, is offered in evidence, it is required to be accompanied by evidence of its genuineness.

7. SAME—SECOND COPY.—It would therefore follow that a second certified copy, issued and certified, at a later date, by the keeper of the archives, should be supported by confirmatory evidence of the genuineness of the grant.

8. DEPOSITIONS—INTERPRETER.—It seems that a commissioner, appointed by the District Court, by consent of parties, and required to take the testimony in English, may be his own interpreter, and reduce answers, given him in a foreign language, to English, and so certify such answers.

9. SAME.—The District Courts have not the power to appoint to take

depositions, any one not authorized by the general laws of the State to take them.

10. SECONDARY EVIDENCE—JUDICIAL PROCEEDINGS.—It is not competent to prove a record still in existence, by oral testimony, as a means of establishing a title of record, in lieu of the ordinary mode of proving records.

11. DESCRIPTION.—Without some specific designation of the part of the tract that was recovered in the judgment of affirmance, when only a part of the tract was recovered, the surveyor would have no legal direction in making a survey preparatory to the patent, as required by the law authorizing suit, under the act of August 15, 1870; and it seems that where title was shown to a definite number of leagues out of a larger survey, the plaintiff should show where the excepted part is situated.

12. STATUTE CONSTRUED.—It is the obvious intent of the law under which this suit was instituted, to benefit the parties interested, by a confirmation of grants, either perfected or commenced and progressed with to an extent that would reasonably have insured its consummation, had there been no change of government.

13. SAME—CONSTITUTIONAL LAW.—Such confirmation is not obnoxious to the Constitution of the State, (of 1869,) providing that "the Legislature shall not hereafter grant lands to any person or persons, nor shall any certificates of land be sold at the General Land Office, except to actual settlers upon the same, and on lots not exceeding 160 acres." (Const. of 1869, art. 10, sec. 6.)

14. PRESCRIPTION, TITLE BY, NOT AIDED BY THIS STATUTE.—The statute under which suit is brought requires the evidences, &c., of title to be filed with the petition, and only authorizes suit by the "grantor, heir, or legal assignee of any grant of land emanating from the Spanish or Mexican Governments, showing its origin previous to the 19th of December, 1836." This language would, ordinarily, import a paper title of some kind, capable of being filed in court with the petition; so that, as prescription could not be so evidenced, it cannot be held that the statute affords any aid to a title claimed by prescription.

15. SAME—FORTY YEARS' POSSESSION.—A right as against the Government might have accrued under the Spanish and Mexican Governments, under which the party in possession might defend his right to the land by prescription, as against a subsequent grantee of the same land; but it does not follow that such party is entitled to aid from the statute, which, by its terms, is inapplicable.

APPEAL from Travis. Tried below before the Hon. J. P. Richardson.

This is one of a large number of suits brought under "An act to ascertain and adjudicate certain claims for land against the State, situated between the Nueces and Rio Grande rivers," approved August 15, 1870, (Paschal's Dig., art. 7068.) The first section of the act will be·found in the statement of the succeeding case. (State v. Cuellar, *post*, 295.) Sections 2 and 6 of the same act are as follows, viz:

" SEC. 2. That each of the claimants shall, at the time of filing of said claim, accompany the same with an affidavit, made before some competent officer, that the title, or evidences of title, of the claim submitted for investigation, is not forged or antedated, but that the same is genuine, and that he is the true and lawful owner, or part owner, thereof, and that all the facts set forth in his petition are true, to the best of his knowledge and belief; and any claimant swearing falsely as to any of the facts herein required to be sworn to, shall be deemed guilty of perjury, and, on conviction thereof, shall be punished accordingly."

" SEC. 6. The District Court shall, without the intervention of a jury, proceed to render judgment upon the pleadings and evidence in any such case, and shall, on application of either party, grant an appeal to the Supreme Court, upon such terms and conditions and requirements as appeals are granted in other cases."

The pleadings and evidence sufficiently appear in the opinion.

*James H. Bell,* and *Chandler, Carleton & Robertson,* for appellee. — This suit was brought by the plaintiff·in the court below against the State, under the authority conferred upon him, as he insists, by an act of the Legislature of the State, passed 15th of August, 1870. (See Acts of 1870, pp. 201–204.) The object of the suit is to determine whether or not the plaintiff is the legal owner of the land in controversy, as between him and the State; and if it shall be determined that the plaintiff is

the legal owner of the land, for a judgment and decree of this court against the State to that effect.

The plaintiff's petition contains a complete history of the manner in which he deraigns and claims title to the land sued for. To that petition the Attorney General of the State has filed general and special exceptions.

Before we attempt to discuss the grounds of demurrer, we propose, briefly, to refer to the several organic and statute laws under which the plaintiff's grantors obtained their title to the land in controversy.

The land, at the date of the grant, was within the limits of what was then the State of Tamaulipas, then a part of the Government of Mexico, and now a part of the State of Texas.

The colonization laws of Coahuila and Texas and the colonization laws of Tamaulipas are the same in substance. (For the colonization laws of Coahuila and Texas, 1825, see Laws of C. and T., pp. 15–23; for the laws of 1832, id., pp. 189–193; colonization laws of Tamaulipas, id., pp. 344–349.)

The first section of the law of Tamaulipas reads as follows: "Article 1. Foreigners, who wish to colonize vacant lands in the State, shall be admitted, and their persons and property protected, provided they submit to the laws of the Republic and those of the State."

The thirteenth section provides that a preference shall be given, first, to the military entitled to lands; next, to native-born citizens of Mexico. In fact, all the laws of Mexico and the different States of that Government have given a preference to those who were entitled to lands for military services; and it will be borne in mind that the land involved in this suit was granted for military services rendered in protecting the frontier from Indian incursions.

Section twenty-five of the same law reiterates, in substance, section thirteen, and then provides for preferences, even between its own Mexican citizens.

But the plaintiff claims title to the land described in his petition under the act of the Congress of the State of Tamau-

lipas, passed the nineteenth day of October, 1833.   A translated copy of said law is given, as follows:

" No. 24. The Constitutional Congress of the free State of Tamaulipas has decreed the following:

"ACTICLE 1. To the inhabitants of Camargo, Mier, Guerrero, and Laredo, who may have no lands of their own, and who may possess stock to occupy them, there shall be given, at once, as much as five leagues each, and, in recompense, they shall pay the State $10 for each league.

"ART. 2. Those only are comprehended in the foregoing article who lived in said villages during the last Indian war, now passed, and who did not emigrate previous to the year 1821.

"ART. 3. The respective ayuntamiento shall inform itself, by previous justification, whether the interested party who may present himself has lands of his own, and stock with which to occupy them.

"ART. 4. These lands shall not be alienated until twenty years have passed after the concession; and if so alienated, the State recovers its right in them, and he who may have been the owner loses whatever advances and useful and necessary improvements that he may have made; it being sufficient for a judgment of condemnation that the alienation shall be made to appear.   Upon this point the respective administering judge shall decide summarily, without prejudice to the legal remedies of the interested party.

"ART. 5. The benefits of article 1 shall continue for three years, from the day of the approval of this decree, after the expiration of which term no one shall obtain lands, except according to the ordinary laws.

"ART. 6. The ayuntamientos and their individual members, collectively, and each one for himself, are responsible, personally and pecuniarily, if they are wanting in the truth of the inquiry exacted by article third; and the Government, having heard their defense, shall make their responsibility effective.

" The Governor of the State shall take care that this decree be understood, and shall order its execution, having it printed, published, and circulated.    Rafael Fernandez, D. P.; Jose Ignaceo Saldana, S. S.; Juan Bautista de la Garza, D. S. S..

"Wherefore, I command that it be-printed, published, and circulated, and that it be duly executed.

" City of Victoria, October 19, 1833, 10th of the installation of the Congress of the State.

"FRANCISCO VITAL FERNANDEZ.

" GABRIEL ARCOS, Secretary of State."

And the eighteenth article of said law goes further to sustain us in this position.

The benefit of the first article of the act of the 19th October, 1833, continued for three years, which time expired the 19th of October, 1836.

Independent of the act just cited, the plaintiff's title is valid under the following sections of decree of 17th November, 1833, of the Constitutional Congress of the free State of Tamaulipas:

"ART. 9. Every Mexican or foreigner who may wish to radicate himself in any of the towns of the State, shall present himself personally to the respective alcalde, manifesting his intention, and, without any other requisite except that of swearing to comply with the laws of the country, he shall be held as an inhabitant; his name shall be inscribed in the book of registry, noting his age, condition, country, religion, and calling, of which an account shall be given to the chief of the department, who shall report to the Government."

"ART. 17. Inhabitants of the State who may enter into enterprises of colonization, according to article 5, shall have, gratis, the lands that for such object are designated in this law."

Were it not for the fact that the territory in which the land in controversy is situated has, by revolutions and other changes of government, been made subject to the organic and statute laws of three national governments and the·

present State Government, which has its third Constitution, we would here rest our case upon the question of demurrer.

While we all know that the Rio Grande was claimed as the southwestern boundary of the late Republic of Texas, we also know that the late Republic of Texas never did have political or judicial jurisdiction over the country south and west of the Nueces; neither did the State of Texas, until after General Taylor took possession of it with his troops, in 1845. And by reference to the last clause in the fourteenth section of the Constitution passed by the Consultation of the late Republic, we find that it only required " the archives of the political chiefs of Nacogdoches, Brazos, and Bexar to be transmitted to the Governor and Counsel. (Paschal's Dig., art. 14.)

From the above, we find that the Consultation made no provision for the filing of titles or ascertaining the rights of parties to any part of the territory in the State of Tamaulipas.

The eighteenth article shows the class of land titles that was declared void, (Paschal's Dig., 28,) and that did not include the territory or class of land titles involved in this suit.

The first section of the schedule to article 6 of the Constitution of the late Republic reads as follows :

" SECTION 1. That no inconvenience may arise from the adoption of this Constitution, it is declared by this convention, that all laws now in force in Texas, and not inconsistent with this Constitution, shall remain in full force until declared void, repealed, altered, or they expire by their own limitation." (Paschal's Dig., 35.)

This section clearly shows that all private rights were preserved, except those that were especially annulled in subsequent provisions of that Constitution.

The eighth section of the General Provisions shows how and for what causes the rights of parties to realty should be forfeited. (Paschal's Dig., 36.)

And this court has repeatedly held, that private rights were not destroyed by the change of government. (McMullen v. Hodge, 5 Tex., 34; Kilpatrick v. Sisneros, 23 Tex., 130.)

The last clause in the tenth section of the general provisions shows what titles were annulled by that Constitution. (See Paschal's Dig., 38.)   And it will not be insisted that the titles to the lands in question were annulled by that provision. Thus far we have argued the case as though the plaintiff's rights in this suit depended alone upon the organic law and statute laws of the late Republic and State of Texas, but we confidently assert that the plaintiff's title is sustained by the laws of nations and the treaty of Guadalupe Hidalgo between the United States and Mexico.   The act under which these suits were instituted provides as follows:

"Section 1.   *   *   *   The said District Court shall investigate the same (the titles, or evidences of titles, or right, under which the lands may be held or claimed) in accordance with the laws of nations, the laws, usages, and customs of the Government from which the claim is derived, and the principles of equity, so far as the same may be applicable, and shall give judgment for confirmation when the title is perfect, or, when imperfect, when the same would have been matured into a perfect title under the laws, usages, and customs of the Government under which it originated, had its sovereignty over the same not passed to and been vested in the Republic of Texas," etc.

First. We insist that neither the late Republic of Texas, nor the State of Texas, ever had either political or judicial jurisdiction over the territory included in the act under which these suits were brought, until obtained by the conquest of the same by the United States and the subsequent treaty of Guadalupe Hidalgo.

Second. That inasmuch as the Republic of Texas, at the date of annexation to the United States, had no political or judicial jurisdiction over said territory; and inasmuch as by the terms of annexation, Texas conferred the right upon the

United States to adjust all questions of boundary that might arise with other Governments,—under the eighth and ninth sections of the treaty of Guadalupe Hidalgo, the plaintiffs and the parties referred to, (whose suits are now pending,) are protected in their titles, whether legal or equitable, to all lands within the limits of the State of Tamaulipas that were purchased in good faith prior to the ratification of the treaty and the actual cession of the sovereignty of the soil by Mexico.

In order to sustain the right that we assert, we propose to show from the proceedings of the Consultation, the Constitution of the late Republic, the journals of said bodies, and the journals and acts of Congress, and the Constitution, journals, and acts of the Legislature of the State of Texas, as well as from the recognized history of Texas—

First. That up to the date of the adoption of the Constitution of the Republic, the people of Coahuila and Texas did not assert any claim to any part of the territory of the then State of Tamaulipas.

Second. That up to the date when General Taylor landed his troops at Corpus Christi, in 1845, neither the people of the Republic, or the State of Texas, or the United States, had or exercised judicial or political control over any part of the State of Tamaulipas, or south or west of the Nueces river; that the territory between the Nueces and Rio Grande rivers never was within the limits of the Government of the late Republic of Texas.

Third. That up to the date of the treaty of Guadalupe Hidalgo, the territory between the Nueces and Rio Grande rivers, and described in the act under which this suit is instituted, was, up to the date when General Taylor landed his troops at Corpus Christi, in 1845, within the limits and jurisdiction of Tamaulipas and Mexico.

To show that the people of Texas, in their attempt to establish a new Government, did not claim beyond the limits of Coahuila and Texas, we will briefly refer the court, first, to

the journals of the Consultation of Texas. In the proceedings at the adjourned meeting of that convention, held at Columbia, on the 15th of August, 1835, they called for representatives from the different municipalities of the State of Coahuila and Texas. (See Journal of the Consultation, pp. 3–5.) And their first meeting at San Felipe. (Id., pp. 6–9.) Up to the 6th of November, 1855, the convention refused to declare their independence. (Id., pp. 18, 19, 21, 22, 38, 39; see also arts. 14 to 18, of the Constitution of the Consultation, pp. 46, 47, 50, 60.)

In the report of the Committee on Finance, in which they recommend the establishment of ports of entry, to collect revenue, we find the following:

"It will become neccessary, in order further to carry into effect the revenue laws hereafter to be enacted, to divide the whole coast into revenue districts. Your committee have decided upon the following division of the coast, which is naturally suggested by its geographical as well as topographical features:

"First. All that part of the coast lying between the Sabine and Caney creek, comprehending the ports of Sabine, Galveston, and Velasco, and all others that may be hereafter established within the said limits, to be called the Eastern District.

"Second. All that part of the coast lying between Caney creek and the western boundary of Texas, comprehending the ports of Matagorda, Lavaca, Copano, and all other which may hereafter be established within the said limits, to be called the Western District." (See Journals of the Consultation, p. 66.)

The above shows that the committee only claimed dominion over Coahuila and Texas. (See also Journals of the first Congress, pp. 11, 12, 21, 24, 26, 116, 117, 136, 138, 155, 156, 175, 230, 256, 257, 259, 275, 301.)

In addition to the above references, made to show that the revolting provinces only claimed the territory of Coahuila

and Texas, we refer the court to Yoakum's History of Texas, which, we believe, is regarded as accurate and good authority as can at this late day be found. In volume 1, page 32, we find the following:

"Here, then, in the settlement by La Salle, under the orders of his sovereign, and the monstrous pretensions of Spain, is laid the foundation of a controversy, which, being transferred from one party to another, is finally and forever closed by the treaty of Guadalupe Hidalgo, made between the United States and Mexico, on the second of February, 1848."

In October, 1835, the Mexicans commenced their war movements in Goliad. (Id., p. 355.)

See Sam Houston's letter to President Jackson, February 13, 1835, in which he says: "My opinion is, that Texas will, by her members in convention, on the first of April, declare all that country as Texas proper, and form a State Constitution." (Id., p. 466.)

In November, 1835, a detachment from Nueces was sent to Goliad, which captured Lipantitlan, on the Nueces, above San Patricio. (Id., p. 19.)

It appears from a report of Doctor James Grant, that on the third of October, 1835, Tamaulipas was *not* one of the revolting States. (Id., p. 22.)

Doctor James Grant, during the battle, and while they were in front of and taking San Antonio, in December, 1835, tried to get up an expedition for the interior, and painted in rich colors the spoils of Tamaulipas. (Id., vol. 2, pp. 44, 46, 50.)

The terms of the treaty proposed by General Houston with Santa Anna, shows that Texas had not claimed beyond the Nueces. (Id., vol. 2, pp. 154, 156; see also p. 274.)

The treaty entered into between General Santa Anna and D. G. Burnett, as President, shows that it only applied to the territory of Coahuila and Texas. (Id., p. 526.)

And again, the fourth article of the secret agreement between Santa Anna and the President of Texas. It says:

"A treaty of commerce, amity, and limits, will be established between Mexico and Texas, the territory of the latter not to extend beyond the Rio Bravo del Norte." (Id., p. 528.)

That shows that Texas did not then claim dominion over any territory beyond the limits of Coahuila and Texas, even when capitulating with Santa Anna, who was then in *durance vile*,—in law not capable of making a treaty that would bind him or his Government. Texas did not absolutely claim the territory beyond the limits of Coahuila and Texas, and left the question open for subsequent stipulations and contract, if they could get it.

Again, in the letter of Santa Anna to General Houston, dated November 5, 1836, (pages 530, 531. Yoakum, vol. 2,) we find the question of boundary discussed, showing that nothing definite had been determined in regard to boundary.

The above shows most conclusively, that neither Texas nor Mexico regarded the revolt, and new Government established, as being claimed to extend beyond the limits of Texas. Again, in the letter from President Houston to General Santa Anna, dated March 21, 1842, he does not claim any territory beyond the boundaries of Coahuila and Texas. (Id., 544, 558.)

In August, 1836, Houston occupied San Patricio. (Id., pp. 191, 192.)

In the summer of 1836, General Corro advised raising more troops, to make headquarters at Matamoras. (Pp. 178, 181; see p. 206; also pp. 216, 289, 290, 291, 297, 312, 313.)

The Legislature of Coahuila and Texas alone, in its last days, referred to as disposing of the lands of Texas. (Pp. 229, 238.)

In 1837, five hundred Mexicans came in as far as San Patricio. (Page 241.)

In 1838, the Mexicans were in force in Matamoras. (Pp. 258, 288.)

In 1841, Captain Dimmit and his men were captured fifteen miles below Corpus Christi. (P. 319.)

General Houston, in his first proclamation as commander-in-chief of the army, addressing himself to the people of Texas, repeats the name of Texas eleven times in that message, but he makes no allusion to the State of Tamaulipas, or the territory, or the people of that State.      (Vol. 2, pp. 450, 452.)

We also find that the Congress of the Republic, on the twenty-first of November, 1836, could not have claimed any part of the territory of Tamaulipas.

The judiciary committee made the following report:

"The judiciary committee, to whom was referred a bill from the Senate, 'authorizing the President to have the colonization laws translated,' have had the same under consideration, and have instructed me to report the bill with the following amendments: Strike out all after the word 'to,' in the fifth line of the first section, and insert the following: 'Employ a suitable person to translate the colonization laws of Coahuila and Texas, and also the colonization laws of the Republic of Mexico, so far as they relate to Texas, at as early a period as practicable.'"     (See Journal, p. 175.)

If they had claimed any part of Tamaulipas, they most certainly would have made provision for the translation of her colonization laws as well as the laws of Coahuila and Texas, for it would be more essential to have the laws of Tamaulipas translated, than those of Coahuila and Texas, because all the archives and evidences of land titles were on the other side of the Rio Grande.

We find that President Houston, twenty-first of December, 1836, in his veto of the bill establishing a General Land Office, only alludes to the laws and titles to land in Coahuila and Texas.     (See Journal, p. 301.)

The first act or proceeding that we find on the part of the people of Texas, claiming that the boundaries of the Republic extended beyond the limits of Coahuila and Texas, was the act of the nineteenth of December, 1836, which reads as follows:

"SEC. 1. *Be it enacted by the Senate and House of Representatives of the Republic of Texas, in Congress assembled,* That from and after the passage of this act, the civil and political jurisdiction of this Republic be and is hereby declared to extend to the following boundaries, to wit: Beginning at the mouth of the Sabine river, and running west along the Gulf of Mexico three leagues from land, to the mouth of the Rio Grande; thence up the principal stream of said river to its source; then due north to the forty-second degree of north latitude; then along the boundary line, as defined in the treaty between the United States and Spain, to the beginning; and that the President be and is hereby authorized and required to open a negotiation with the Government of the United States of America, so soon as in his opinion the public interest requires it, to ascertain and define the boundary line, as agreed upon in said treaty." (Paschal's Dig., p. 192, art. 438.)

Again, the act of the twenty-second of December, 1836, establishing the powers and jurisdiction of District Courts and creating judicial districts, only claimed jurisdiction over the country to the Nueces. (See Acts of 1836, p. 199.)

Notwithstanding they claimed all the territory from the mouth of the Sabine river to the mouth of the Rio Grande, the proof is abundant that they never were able to hold dominion over or possession of the territory between the Nueces and Rio Grande rivers, until it was ceded to Texas by the treaty of Guadalupe Hidalgo, between the United States and the Government of Mexico. This fact is admitted by the Legislature of the State, as late as January, 1858, (see Journals of the House, vol. 7, p. 702,) in a report of claims in favor of certain citizens of Laredo, which report was adopted by the House of Representatives, (see Journal of House, p. 797,) and afterwards adopted by the Senate. (See Senate Journals of 1858, pp. 328, 329, and the bill which was approved by the Governor.) .

The Senate report says: "There can be no pretense that,

under the treaty of Santa Anna, and the passage of the act of December, 1836, the Territory of Texas extended beyond the Nueces and Medina." (Senate Journals, p. 328.)

The House report says: "The committee believe that under no equitable or legal view of the law can they (certain citizens of Laredo) be entitled to head-rights as citizens of Texas, because Laredo was, at the date of the Declaration of Independence, a part of the State of Tamaulipas, and continued under Mexican jurisdiction until 1845—its citizens adhering to the enemy." (House Journals, p. 702; the House report was adopted by the Legislature.)

The same principle is judicially decided in the case of Trevino v. Fernandez, 13 Tex., 631, et seq., and cases cited; Brownsville v. Basse & Hord, 36 Tex., 461, and cases cited.

To show that the Government of Mexico claimed all the territory between the Nueces and Rio Grande, at the date of the treaty of Guadalupe Hidalgo between the United States and Mexico, which bears date second of February, 1848, in the instructions of the Mexican Government of the 29th of August, 1847, to the commissioners appointed to negotiate a treaty with the United States commissioner, N. P. Trist, esq., we find the following language:

"It is supposed they know that if greater advantages cannot be drawn from the territory of Texas, they must adopt the opinion of the Government, who believe that no further concession shall be made than the limits of Texas as known and recognized; they do not pass the river Nueces, which is the natural boundary of Texas, and in no manner does its limits reach to the river Bravo," which means the Rio Grande. (See Public Pamphlets, vol. 2, p. 331.)

And in a note addressed by said commissioners to Mr. Trist, dated September 6, 1847, we find the following more emphatic language:

"In our conferences we have informed your excellency that Mexico cannot cede the belt which lies between the left bank of the Bravo and the right of the Nueces. The reason

entertained for this is not alone the full certainty that such territory never belonged to the State of Texas, nor is it founded on the great value, in the abstract, which is placed upon it. It is because that belt, together with the Bravo, forms the natural barrier for Mexico, both in a military and commercial sense, and the barrier of no State ought to be sought, and no State can consent to abandon its barrier.

"But in order to remove all cause for trouble hereafter, the Government of Mexico engages not to found new settlements, or establish colonies, in the space between the two rivers, so that, remaining in its present uninhabited condition, it may serve as a safeguard equally to both republics. Pursuant to our instructions, the preservation of this territory is a condition, *sine qua non*, of peace. Sentiments of honor and delicacy, (which your excellency's noble character will know how worthily to estimate,) even more than a calculation of interest, prevent our Government from consenting to the dismemberment of New Mexico. Upon this point, we deem it superfluous to add anything to that which we had the honor to explain to you orally in our conference." (See Public Pamphlets, vol. 11, pp. 336, 337; see Mitchell's map of Texas, 1836, published contemporaneously with the Declaration of Independence on the part of Texas, etc.)

We also find, in the fourth division of a counter-project for a treaty prepared and presented by the Mexican Government, dated 5th of September, 1847, that the Mexican Government insisted upon the Nueces as the boundary line. (Id., p. 329.)

And the eleventh division of said project reads as follows:

"All the grants of lands made by Mexican authorities in territories belonging heretofore to the Republic, and by this treaty to be for the future within the limits of the United States, shall be valid and permanent, and shall be sustained and guarded forever by the Government of the said United States." (Id., p. 341.)

The law charges this court with judicial notice of the fact

that neither Texas nor the United States had civil jurisdiction over the territory until after the treaty of Guadalupe Hidalgo. Hence it follows that all rights acquired by Mexican citizens under the political or judicial authority of the State of Tamaulipas were and are valid, and binding upon the State of Texas and its inhabitants, as well as the United States, and we insist that the parties to this suit are protected in their titles by the eighth and ninth articles of the treaty of Guadalupe Hidalgo. Now, let us turn to the treaty itself, and see what its stipulations were in relation to lands held under sales and titles emanating from the Mexican Government, and see if we can, under its terms and the laws and decisions applicable to the questions arising in the case, sustain the position we here assume. The last clause of the eighth article of that treaty reads as follows: "In the said territory, property of every kind, now belonging to Mexicans not established there, shall be inviolably respected. The present owners, the heirs of these, and all Mexicans who may hereafter acquire said property by contract, shall enjoy, with respect to it, guarantees equally ample as if the same belonged to citizens of the United States." (U. S. Statutes at Large, vol. 9, p. 929.)

The first clause in the ninth article of that treaty reads as follows: "The Mexicans who, in the territories aforesaid, shall not preserve the character of citizens of the Mexican Republic conformably with what is stipulated in the preceding article, shall be incorporated into the Union of the United States, and be admitted as soon as possible, according to the principles of the Federal Constitution, to the enjoyment of all the rights of citizens of the United States, in the mean time shall be maintained and protected in the enjoyment of their liberty, their property, and civil rights now vested in them according to the Mexican laws." (Id., vol. 9, p. 930.)

The original grantee in this case had performed all the conditions precedent before the title to the land involved in this suit was extended. All of which is fully stated and set

forth in the petition and order of the Governor, as well as in the face of the title itself. ·

By the foregoing references, and extracts from the constitutions and laws, and correspondence, and from the articles of the treaty, we have shown that the plaintiff's title was issued in strict conformity to the laws in force at the date of its execution, and that the same has not been abrogated, annulled, or set aside by any judicial or political authority, and that it now remains in full force and effect.

But one of the grounds of special demurrer to the plaintiff's petition is, that the act of the Legislature under which this suit is instituted, is in violation of the Constitution of the United States, consequently void. As that question is raised by the Attorney General, it behooves us to examine the terms and conditions upon which the late Republic of Texas was annexed to and became one of the States of the Union; and what rights and interest were ceded by Texas, and what she reserved to herself, and then and now holds in her capacity as one of the local Governments of the Federal Union.

The second section of the articles of annexation provides—

"First. Said State to be formed, subject to the adjustment by this Government of all questions of boundary that may arise with other governments."

After specifying the property ceded to the United States Government, it further says:

"Texas shall retain all the public funds, debts, taxes, and dues of every kind which may belong to or be due and owing said Republic; and shall also retain all the vacant and unappropriated lands lying within its limits, to be applied to the payment of·the debts and liabilities of said Republic of Texas, and the residue of said lands, after discharging said debts and liabilities, to be disposed of as said State may direct." (Paschal's Dig., p. 44, sec. 2.)

Inasmuch as the State of Texas is, by the express terms of annexation, the owner of all the public and unappropriated lands in the State, we confess our utter inability to under-

stand how the act of the Legislature of the State, under
which this suit is brought, can be in violation of any word,
sentence, or provision of the Constitution of the United
States.

Surely the United States has not the remotest interest in
the land involved in this suit, further than to see that the
owners of lands within the limits of the United States are
protected in their titles, as provided for in the stipulations in
the treaty of Guadalupe Hidalgo.

The act under which this suit is brought is substantially a
copy of the act passed for the same purpose on the 11th of
February, 1860. (See Paschal's Dig., pp. 739, 741, art. 448.)

That act was limited to three years; but the late rebellion,
that broke out early in 1861, prevented the parties interested
from availing themselves of the advantage conferred upon
them by the above-named act, and for that reason the Legis-
lature of 1870 did not hesitate to pass the act authorizing
the institution of this suit.

It must be borne in mind that the title claimed by plain-
tiff was acquired from the Government of the State of Ta-
maulipas, when it was within and constituted a part of the
Government of Mexico. Under the terms of the treaty
already cited, the original grantee, his heirs, and assigns, are
fully protected. That being so, it was not within the power
of the framers of any Constitution of the State, or the Legis-
lature of the State, to destroy or impair the validity of that
grant since the date of the treaty of Guadalupe Hidalgo.
(Paschal's Annotated Const., p. 155, sec. 157, and authorities
cited; Green v. Biddle, 8 Wheat., 92; Bronson v. Kinzie, 1
How., 319; McCracken v. Hayward, 2 How., 612; People v.
Bond, 10 Cal., 570: Ogden v. Saunders, 12 Wheat., 231;
Von Hoffman v. City of Quincy, 4 Wall., 550.)

The court is respectfully requested to read the above au-
thorities, and particularly the case of Von Hoffman v. The
City of Quincy, 4 Wall., 550, and Green v. Biddle, 8 Wheat.,
92; Con. R. P., top page, 369.

The second ground of demurrer is, that the act of the Legislature authorizing this suit is in violation of the Constitution of this State. And we are advised that the learned counsel will insist that it is in violation of the sixth section of the tenth article of our State Constitution, which is in the following language:

"SECTION 6. The Legislature shall not hereafter grant lands to any person or persons, nor shall any certificate for land be sold at the land office, except to actual settlers upon the same, and in lots not exceeding one hundred and sixty acres." (See Constitution of 1870, p. 32, sec. 6.)

By reference to the act authorizing this suit, we find it does not, directly or indirectly, grant or authorize the granting any of the public domain of the State; it simply admits that there are lands within the limits of the territory described in the act, that different individuals claim to be the owners of, and that there is. at least some doubt as to whether the claimants or the State have the better titles to said lands.

As a government can only be sued when the organic or statute law shall create a forum and prescribe the manner when, where, and how such suits shall be instituted, the Legislature, by passing the, act referred to, simply created a forum and prescribed the rules under and by which the titles to those lands shall be adjudicated; and if the claimants shall establish their titles by evidence under the rules prescribed in the act, then the plaintiff shall have judgment against the State for the land; and, in addition to the usual decrees in favor of the plaintiff, the law further provides that the Commissioner of the General Land Office shall issue a patent for the land in the name of the original grantees or their heirs. As a matter of course, if the plaintiff fails to establish his title to the land, as required by the act, the judgment will be against him, and the land adjudged to be the property of the State. That is all there is in the act.

If it is possible that we are wrong in this position, then we assume a more cogent and stronger position, and that is, that

neither the sixth section of the tenth article, or any other provision of the State Constitution, can be invoked to destroy the higher right of the plaintiff in this suit, for we have already shown that, by the terms of annexation, the United States reserved the right to adjust all questions of boundary; and by the stipulations of the treaty of Guadalúpe Hidalgo, and particularly the eighth and ninth sections of said treaty, the plaintiff is fully protected in his title, and it cannot be adjudged invalid without openly violating one of the most sacred provisions of said treaty, and one that would authorize the Mexican Government to disregard the entire treaty. (6 Pet., 691; The United States *v.* Percheman, 7 Pet., 86; Delassus *v.* The United States, 9 Pet., 133; Vanderslice *v.* Hanks, 3 Cal., 27; Ware *v.* Hylton, 3 Dall., 199; Strother *v.* Lucas, 12 Pet., 410.)

The court is also referred to the following treaties between the United States and other nations from which territory has been acquired, which, in all cases, protect the rights of individuals in the acquired territory:

First. Treaty between Spain and the United States, dated October 27, 1795. (See U. S. Stats. at Large, vol. 8, p. 138; also Act of Congress of May 6, 1796, vol. 1, p. 459; also Act dated July 16, 1798, vol. 1, p. 609.)

Second. Convention between Spain and the United States, dated August 11, 1802. (See U. S. Stats. at Large, vol. 8, p. 198; also Act of Congress of March 16, 1804, U. S. Stats. at Large, vol. 2, p. 270; and Act of February 14, 1805, vol. 2, p. 314.)

Third. Treaty between Spain and the United States, dated February 22, 1819, and October 29, 1820. (See U. S. Stats. at Large, vol. 8, p. 252; also Act of Congress of May 24, 1824, vol. 4, p. 33.)

Fourth. Treaty between Spain and the United States, dated February 17, 1834. (See U. S. Stats. at Large, vol. 8, p. 460; also Act of Congress of June 7, 1836, U. S. Stats. at Large, vol. 5, p. 34.)

.Acts of Congress relating to Florida and Florida land claims, and to determine right of private citizens originally acquired under the Government of Spain: January 15, 1811, vol. 3, p. 471; March 3, 1819, vol. 3, p. 523; March 3, 1821, vol. 3, p. 637; March 30, 1822, vol. 3, p. 654; March 30, 1822, vol. 3, p. 660; May 7, 1822, vol. 3, p. 685; May 8, 1822, vol. 3, p. 709; March 3, 1823, vol. 3, p. 750; February 28, 1824, vol. 4, p. 6; May 26, 1824, vol. 4, p. 45; April 22, 1826, vol. 4, p. 156; May 4, 1826, vol. 4, p. 157; February 8, 1827, vol. 4, p. 202; April 28, 1828, vol. 4, p. 264; May 23, 1828, vol. 4, p. 284; January 21, 1829, vol. 4, p. 333; May 26, 1830, vol. 4, p. 405; January 3, 1832, vol. 4, p. 496; June 28, 1832, vol. 4, p. 550; June 15, 1844, vol. 4, p. 667; June 15, 1844, vol. 4, p. 671.

It will be seen, by the treaties of the United States with the most civilized nations of Europe, the laws enacted by Congress, and the decisions of the Supreme Court, that the private rights of the individual citizens, within conquered and acquired territory, have been always protected, without any variation; and the State of Texas, notwithstanding the bitterness of the struggle of her people with Mexico for independence, has followed the just and wise precedents established by the national, political, and judicial authorities. Four different Legislatures of this State have enacted laws for the protection of the rights of the claimants to lands under titles issued by the State of Tamaulipas, and four different Governors, to wit, Governors Bell, Pease, Houston, the father of the Republic of Texas, and Davis, have approved these laws. One of them, Governor Davis, lived many years in that section of the State, and was well acquainted with the titles which would be presented for confirmation under this act approved by him, August 15, 1870. The decisions of our Supreme Court of the State have followed those of the Supreme Court of the United States, thus presenting an unvaried history, political and judical, in recog-

nition of these grants, both by the United States and this State.

*Walton, Green & Hill,* also for appellee.

*George Clark, Attorney General,* for the State.

*Peeler & Fisher,* also for the State.—It was insisted in the court below, and we insist here, that this act is unconstitutional.

Section 6 of article 10 of the Constitution of 1870 provides: " The Legislature shall not hereafter grant lands to any person or persons, nor shall any certificates for land be sold at the land office, except to actual settlers upon the same, and in lots not exceeding one hundred and sixty acres." (2 Paschal's Dig., p. 1121.)

We say that this act is, in effect, a legislative grant of lands to these claimants, and that the Legislature cannot do indirectly and under the guise of a judicial proceeding that which it has not the power to do directly.

If it be essentially a grant, it matters not that the court is required to pass upon certain facts before the patent issues. If the constitutional inhibition can be avoided in this way, laws can be easily framed to grant away the entire public domain of the State. It is not the mode, but the right, of doing the thing that is denied to the Legislature.

We do not say that the State cannot permit itself to be sued in its own proper forum, for the purpose of having alleged rights against it litigated and determined. But we do say that the pretended or alleged rights of the claimants here are not proper subjects—matter of judicial cognizance, —but belong, if they can be acted upon at all, exclusively to the political department of the Government. If any of these claimants had existing legal rights, and they were infringed, the courts were open to them, and there was no necessity for such a law. If their rights, however, were imperfect or inchoate, then, as has been frequently held, they were only

a charge upon the conscience of the body politic—their recognition depending upon the will and confirmatory action or grant of the political department. (Smith *v.* U. S., 10 Pet., 332; 16 Id., 153; 2 How., (U. S.,) 344; 6 Mo., 514; 7 Id., 10; 8 How., (U. S.,) 293; 2 Id., 285; 7 Tex., 366; 5 Tex., 412; 1 Tex., 802.)

Suppose the Legislature had granted these lands directly to the claimants: would the grant have been constitutional? Clearly not. If, then, the concession which the act makes is indispensable to bring these claims into life, does it not, as to them, amount to a legislative grant, and is not this doing the very thing which the Constitution says shall not be done? Is it not reasonable to suppose that after the law of 1860, which was almost identical with this, had expired by its own limitation, the convention intended to cut off from future recognition and put an end to these and other ancient, vexatious claims, because of the long lapse of time and of the inviting and not always unoccupied field they presented for fraud? But whatever may have been the reason, the language of the Constitution is plain. Nothing is left to implication. If a legislative grant, it is absolutely void.

The court, however, may reach the conclusion that, as to perfect legal title, the statute is not a grant, but only affirms pre-existing legal grants, and provides the means for their judicial establishment and record, thus maintaining, with respect to these, the constitutionality of the law; whilst, as to imperfect or inchoate rights, in no way binding upon the State, it is to all intents and purposes a grant, and therefore unconstitutional. It is questionable, to say the least, whether, as to imperfect or inchoate rights, belonging entirely to the political department of the Government, the court can be charged with the duty of determining them. Now if, as we understand, counsel on the other side insist that the District Court in these cases sat as a sort of commission, rather than as a court, we deny that the Legislature had, under the Constitution, any power to make it such a commission. Original

18

jurisdiction to try "all suits and cases in which the State may be interested" is conferred on said court by section 7 of article 5 of the Constitution of 1870. (2 Paschal's Dig., p. 1115.) If these be "suits and cases" in which the State is interested, then the District Court had exclusive original jurisdiction over them. If they be not "cases or suits," within the meaning of the Constitution, then the District Court has no jurisdiction over them, and its acts are *coram non judice;* for there is no provision in the Constitution for the superaddition by the Legislature of other duties to the court, or the enlargement of its jurisdiction, and certainly none which sanctions the imposition of duties not judicial in their character—duties which could as well have been conferred on any private individual.

In United States *v.* Ferreira, 13 How., (U. S.,) 40, will be found a discussion of the question here suggested. Congress had directed the judge of the District Court of the United States for the northern district of Florida to receive and adjudicate certain claims under the treaty of 1819 between the United States and Spain. The court held, that an appeal did not lie to the Supreme Court from an award of the district judge; that the decision was not the judgment of the court; and Chief Justice Taney, who delivered this opinion, said, among other things:

"The territorial judges, therefore, in adjusting these claims, derived their authority altogether from the laws above mentioned, and their decisions can be entitled to no higher respect or authority than these laws gave them. They are referred, by the act of 1823, to the treaty for the description of the injury which the law requires them to adjust, but not to enlarge the power which the law confers, nor to change the character in which the law authorizes them to act.

"The law of 1823, therefore, and not the stipulation of the treaty, furnishes the rule for the proceeding of the territorial judges, and determines their character. And it is manifest, that this power to decide upon the validity of these claims is

not conferred on them as a political function, to be exercised in the ordinary forms of a court of justice, for there is to be no suit; no parties, in the legal acceptance of the term, are to be made; no process to issue; and no one is authorized to appear on behalf of the United States, or to summon witnesses in the case. The proceeding is altogether *ex parte*, and all that the judge is required to do, is to receive the claim when the party presents it, and to adjust it upon such evidence as he may have before him, or be able himself to obtain. But neither the evidence nor his award are to be filed in the court in which he presides, nor recorded there; but he is required to transmit both the decision and the evidence upon which he decided to the Secretary of the Treasury, and the claim is to be paid, if the Secretary thinks it just and equitable, but not otherwise."

The difference between the powers conferred by the act referred to in this opinion and those conferred by our statute, especially in the manner of their execution, is very apparent. Here we have a suit—a regular petition—setting forth a full and particular description of the lands claimed, accompanied with the evidence of title, and sworn to; provision is made for the issuance of subpœnas and the taking of testimony, oral and by deposition; the Attorney General is required to represent the State; appeal is permitted to the Supreme Court, as in other cases, and the judgment of the court is to be rendered upon the "pleadings and the evidence." Surely, there can be no question but that the proceedings under the statute are a suit. They are spoken of as a suit—a suit against the State, it is true, but not the less a suit—which must, except in so far as the statute has permitted a change, be conducted and determined as are other cases.

In Rose *v.* Governor, 24 Tex., 504, it was held "that the right to sue the Governor or the State is matter of favor conferred by the State, in derogation of that immunity which every sovereignty enjoys; and we think that statutes conferring such privileges should be construed with strictness, so as

to extend the right only to those by whom it was clearly intended that it should be enjoyed."

In the case of Houston v. Robertson, 2 Tex., 20, which was brought under the law authorizing suits against the State, by empresarios, Chief Justice Hemphill, who delivered the opinion, in discussing the statute under which suit was brought, said: "The consent of the Government to be sued is given on terms. She had the right and power to determine what questions should be decided, and the rules which should govern the decisions." And in the case of Houston v. Perry, 2 Tex., 51, which was brought under the same statute, the same learned judge said: "As a general rule, the plaintiff claiming lands from the Government must allege and fully prove all the facts necessary to support his claim. No presumption is to be raised as against the Government, who is a stranger to all the matters and things alleged in the petition not judicially within the knowledge of the court, and who, if she does not controvert, cannot admit the truth of the averments of the claimant."

We think it clear, that to entitle plaintiffs to judgment of confirmation, they must satisfy the court that their suit has been instituted and prosecuted according to the statute, and that they have fully and strictly complied, in their allegations and proofs, with its provisions.

We will now examine, briefly, some of these requirements.

1. Suit must be brought within two years from the passage of the act. (Sec. 10.) It expired August 15, 1872.

2. The plaintiff must allege and prove that he is the original grantee. The statute does not open the door to every one; it designates the particular character of persons who may enter. A person, therefore, claiming as original grantee, must clearly establish that he is such grantee. One claiming as heir, must establish his identity as such, and his right, in whole or in part, by virtue of his heirship, to the grant; and one claiming as assignee, must establish a legal, or what is tantamount to a legal assignment, for the statute uses the term "legal assignee."

Now, all this, we take it, must be established according to the laws of the State of Texas in force at the time of the trial. The merits of the case, as to title, may be controlled by other laws; but we are at a loss to discover how these preliminary questions or conditions precedent, upon which the plaintiff is permitted to come into court at all, can be considered with reference to any other than the *lex rei sitæ.* In other words, we maintain that claimants, under this act, must allege and prove the character in which they sue, and all other matters affecting their right, personally, to maintain the suit, just as in ordinary action. In this respect, they are on the same footing with other suitors, except that strict proof, it seems, should be required in the interests of the State, whether technical objections be taken or not. No one representing the State has the authority to waive or assent to anything to her prejudice, and the claimants suing under the statute, do so, as it were, *cum onere.*

3. The plaintiff must allege and prove that the lands he claims are situated in the territory mentioned in the statute. He is required, in his petition, to set forth particularly the situation, boundaries, and extent of the lands claimed by him. (Sec. 1.)

4. The plaintiff must allege and prove that his title emanated either from Spain or Mexico. The statute recognizes but two sources from which the title can flow: the Government of Mexico or Spain; and it must have had its origin or commencement previous to the 19th day of December, 1836. If after this date, it is without the statute. (Sec. 1.)

5. The plaintiff must next make good his case upon the merits. He is required, as we have seen, to accompany his petition with the title, or evidence of title, or right under which the grant is held or claimed. Upon this point the statute is positive, and its object, no doubt, was to afford the State, at least, some opportunity for detecting frauds and forgeries, should they be attempted. The plaintiff, therefore, must stand by the case which he makes in his petition

and evidences of title; and with his *allegata* and exhibits must his *probata* correspond. His title may be either a perfect or an imperfect one. The statute thus divides them, and applies to each, as we think, slightly different rules of law and evidence. The statute says: "And the said District Court shall investigate the same in accordance with the laws of nations, the laws, usages, and customs of the Government from which the claim is derived, and the principles of equity, so far as the same are applicable, and shall give judgment for the confirmation of the same when the title is perfect, or when imperfect, when the same would have matured into a perfect title under the laws, usages, and customs of the Government under which it originated, had its sovereignty over the same not passed to and been vested in the Republic of Texas: *Provided,* Said title or right was originally founded in good faith."

A perfect title must be determined to be such by the laws of nations—the laws, usages, and customs of the Government from which it is derived, and the general principles of equity, so far as the same are applicable.

An imperfect title must have been such as would have matured into a perfect title under the laws, usages, and customs of the Government under which it originated, had the sovereignty of that Government not passed to the Republic of Texas, and must originally have been founded in good faith. Before considering these tests as applied to each particular title, several questions necessarily arise, the determination of which depend upon the proper interpretation or construction of the statute.

1. If the claimant comes into court on a perfect title, must such title have been perfect prior to 1836, or is it sufficient if perfected at any time before the trial? In other words, are all titles not perfect, according to the laws of Spain or Mexico prior to 1836, to be classed among the imperfect titles? This seems to be the meaning of the law. We do not see how the perfection of a title derived from Spain or

Mexico can be determined by any other than the laws, usages, and customs of those countries. Unless settled by treaty, to them international law would remit the question. That the title should not be perfected at any time before trial, is apparent from the statute, which classifies the titles into perfect or imperfect, at the date of the change of sovereignty to the Republic of Texas. At that date they must have been perfect or imperfect; and if imperfect, they must have been in such a condition that they "would have matured into perfect titles under the laws, usages, and customs of the Government under which they originated," but for the single condition of this change of sovereignty to the Republic of Texas; and further, it must be shown that they originated prior to 1836, in good faith. The plaintiff must establish satisfactorily the *bona fides* of its inception.

When a title is presented, we ask, Was it a perfect title in 1836, or at the time of the change of sovereignty to the Republic of Texas, according to the laws, usages, &c., of the country from which it was derived? This, if clearly shown, and not left to implication, entitles the claimant to a judgment.

It may not be amiss, in this connection, to examine the rules of law by which each case is to be investigated and determined. This leads us to consider the effect of the general expressions of "laws of nations," the "laws, usages, and customs of the Government from which the claim is derived," and "the principles of equity, so far as the same are applicable." These are the statutory guides to the court in its investigations, and relate, not to the practice or mode of proceeding, as may be insisted, but to the very right of the claim.

Under the expression, "laws of nations," every title which would, according to international law, as understood by the enlightened nations of the present day, be respected, ought to be held good, and certainly every title or right confirmed by treaty stipulation, especially the treaty of Guadalupe Hidalgo, should be upheld. This is the extent of its application to the subject. The sentence, "laws, usages, and cus-

toms of the Government from which the claim is derived,"
means nothing more than that these should inhere to and go
along with the title, supplying the tests for its validity, and,
if good by these, it should be held good; that is, the laws in
force and applicable before the change of sovereignty.   The
statute permits, by comity, and in supposed aid of justice,
laws not our own to furnish the rules of decision.   The gen-
eral and seemingly indefinite expression, "the principles of
equity, so far as the same are applicable," was inserted, if for
any useful purpose, perhaps to convey the idea that equitable
and beneficent, rather than harsh and technical rules should
be invoked in passing upon the right, whenever their appli-
cation was necessary to prevent manifest wrong.   The quali-
fication, "so far as applicable," seems to imply a doubt in
the mind of the Legislature of the propriety of the sentence,
and really makes it amount to nothing.   We can understand
what is meant by the "laws of nations, the laws, usages, and
customs of Government," but the "principles of equity" are
certainly, in this connection, too vague and indefinite for a
guide.   In Houston *v.* Perry, 2 Tex., 37, the court held, "that
the rule of the statute requiring empresarios' causes to be
tried as all other land suits are to be tried, was too obscure
and indefinite to furnish a certain guide for judicial action in
such cases."   And so this court may, with the like propriety,
hold, that the words "principles of equity," as used in this
statute, are too obscure and indefinite to furnish a certain
guide for judicial action.   At any rate, the positive guides
which are furnished by the "laws of nations, the laws, usages,
and customs of the Government from which the title is de-
rived," cannot be weakened or rendered less binding on
account of this glittering generality.

Another point to be noticed is, that the customs and usages
referred to are those of the Government, not of the people
of any particular community, but customs and usages which,
sanctioned by the Government, have the force of law.

In addition to the above general argument, counsel dis-

cussed at length the facts, which cannot be sufficiently condensed for insertion.*

ROBERTS, CHIEF JUSTICE.—This action was brought under the law of the 15th of August, 1870, entitled "An act to ascertain and adjudicate certain claims for land against the State, situated between the Nueces and Rio Grande rivers." The claims of land are situated in the territory of Texas that formerly constituted a part of the State of Tamaulipas, in Mexico, which remained, for the most part, under the political and civil jurisdiction of that State, until possession of the same was taken by the troops of the United States, in 1846. It embraced the country between those rivers, "below a line drawn from the northern boundary of Webb county to the mouth of the Moros creek, emptying into the Nueces river." The act authorized "any person who may be the original grantee, heir, or legal assignee of any grant of land emanating from the Spanish or Mexican Governments, and having its origin previous to the 19th day of December, 1836," within said territory, to bring a suit therefor in the District Court of Travis county. The date here mentioned was the date of the law of Texas declaring the boundaries of the State to extend to the Rio Grande, (Paschal's Dig., art. 438,) which boundary was reaffirmed by a joint resolution of the 29th of April, 1846. (Paschal's Dig., art., 441.) The law authorizing this suit required, that the "petition shall contain a full description of the land claimed, setting forth particularly its situation, boundaries, and extent," and the party "shall accompany such petition with the titles, or evidences of title, or right under which the same is held or claimed," "and the said District Court shall investigate the same, in

---

* More than usual space has been allowed for argument, on account of the questions discussed, as well as the interests involved, which amount to over seventy leagues of land, known as the Salt Lake grant. The discussion of counsel in the cases following, brought under the same statute, is omitted.

accordance with the laws of nations, the laws, usages, and customs of the Government from which the claim is derived, and the principles of equity, so far as the same are applicable, and shall give judgment for the confirmation of the same when the title is perfect, or when imperfect, when the same would have matured into a perfect title under the laws, usages, and customs of the Government under which it originated, had its sovereignty over the same not passed to and been vested in the Republic of Texas: *Provided,* Said title or right was originally founded in good faith." "The District Court shall, without the intervention of a jury, proceed to render judgment upon the pleadings and evidence in any such case, and shall, on application of either party, grant an appeal to the Supreme Court, upon such terms and conditions and requirements as appeals are granted in other cases."

"For all claims finally confirmed under the provisions of this act, a patent shall issue in the name of the original grantee, his heirs, and legal assigns, upon presentation at the General Land Office of an authentic certificate of such confirmation, and the field-notes of the district surveyor of the county in which the land may be situated," &c. (Paschal's Dig., art. 7068, and following.)

Upon the pleadings and evidence in this case, the District Court rendered a judgment in favor of plaintiffs below, and the State took an appeal to this court.

The petition describes the various steps taken by the officers of the Government, from the application to the sub-delegate judge of Reynosa, in the province of New Santander, on the 21st of June, 1794, up to the intendant, Salcedo, of San Luis Potosi, and to the Viceroy of New Spain and the council at Mexico, down to the delivery of formal possession by Jose de Goseasecochea, lieutenant of Camargo, on the 18th day of April, 1798, of a grant by sale to Don Juan Jose Balli, of the tract called "San Salvador del Tule," containing seventy-one and a fraction leagues of land.

The plaintiffs claim sixty leagues of this tract, by what is

termed a judicial sale, made at Reynosa, on the 4th day of September, 1829, as the property of the estate of Balli, and purchased by Trute de Cardenas for and on behalf of his mother, Donna Manuella Montemeyor, whose descendants, as heirs, now sue for it.

The papers filed as a title, or evidence of title, as prescribed by the statute, is a document in the Spanish language, containing all of the parts of a most perfect grant to Don Juan Jose Balli, if it were an original testimonio, with what purports to be, in the same language, and attached to the grant, a sale before the alcalde of Reynosa, by him authenticated, by "Francisco de Aneros, as general attorney of his deceased wife, Mrs. Maria Ygnacio de Trevino," to "Trute de Cardenas, as attorney and heir of his mother, Mrs. Manuella Montemeyor, also deceased." It is recited in said instrument that Cardenas had obtained a judicial execution for $2,000 and upwards, which the executrix of her former husband, Don Juan Jose Balli, owes his house; that he had procured the sale of it to satisfy the debt, and had bid off sixty leagues and a fraction of it for $2,500, the other eleven leagues having been disposed of otherwise. There is an indefinite designation of the locality of two of the leagues disposed of to Manuel de la Garza, but none whatever of the locality of the other nine leagues in any part of the proceedings in the case. There is an explanation in the evidence that Mrs. Maria Ygnacio Trevino, the deceased wife of Aneros, was the widow of Don Juan Jose Balli, but none whatever of the authority of Aneros to make the sale as her general attorney, or of any of the judicial proceedings upon which the sale assumes to be based.

The Spanish title closes with the instrument evidencing the act of seizure to Balli performed by the lieutenant, Goseasecochea, with a recital subjoined, that the original papers are delivered to Juan Jose Balli. The instrument of sale closes, as usual, with a certificate of its being a correct copy of the original protocol of records of 1828 by Ignacio

Cano, judge delegate of Reynosa, with his attendant witnesses, on the 11th day of September, 1829.

Both the grant and the transfer, in this condition, have appended to them a certificate or authentic act by Francisco Garcia, alcalde of Reynosa, with witnesses, Leal and Valdes, on the 15th day of November, 1849, reciting as follows: "The foregoing attested copy agrees with its original, which remains in possession of Don Jose Ma. Cardenas. It was copied at the verbal request of the said Cardenas, and other joint parties. It is faithfully copied, corrected, and compared."

To the foregoing, all written in Spanish, is annexed a certificate of the commissioner appointed to investigate land titles of this kind, under the act of the 8th of February, 1850,) Paschal's Dig., art. 4440, and following,) which reads as follows, written in English:

"I hereby certify the above to be a true copy of an original testimonio placed in my hands by Jose Ma. Cardenas, for himself and as agent for other heirs. August 2, 1851. I. B. Miller, Com'r."

Then follows a certificate, by M. Nargravi, clerk of the County Court of Hidalgo county, that the above certificate of Miller "is a true copy, by me compared, of a certificate attached to a copy of the salt lake grant," dated 27th of May, 1856.

To all this is appended two certificates by A. Rutledge, clerk of the County Court of Hidalgo county; one on the 2d day of March, 1871, that the foregoing instruments had been filed for record, and recorded in his office on the 1st and 2d days of March in said year, and the other on the 27th day of August, 1872; "that the above and foregoing is a true copy of the original grant by the Crown of Spain to Juan Jose Balli of a tract of land, containing seventy-one and more sitios, situated in Hidalgo county, as taken from the record, book B, of real estate of said county."

According to these certificates, then, the evidence of title

filed with the petition was a copy three degrees from the original papers in the hands of Cardenas in 1849, and not of the protocol in the alcalde's office, at Reynosa; that is to say, first, the copy, by Garcia, of the original papers, in 1849; second, a copy of that copy, by Miller, in 1851; and, third, a copy of the Miller copy, recorded, without any proof to admit it to record, in 1871, in Hidalgo county, and a copy of that record, certified to by the clerk of the County Court of said county, A. Rutledge, in 1872. This Rutledge copy is the one filed with the petition, as appears by the filing of the clerk thereon, "5th of August, 1872;" this, also, is the copy which, by the agreement of counsel for the State, the Attorney General, was detached from the petition, and attached to the interrogatories accompanying the commission of Noah Cox, for the examination of the witnesses in giving their testimony.

It is true, that one of the witnesses, Caravajal, says that the Miller copy was before him when he was giving his testimony; but his statements, as to how it was certified, shows that it was the Rutledge copy of the Miller copy, unless there was, in fact, then present another copy, to wit, the Miller copy, which was not before the court at the trial, and had not been filed with the petition. Another witness, Gomez, says that there exists a copy of the title and sale authenticated by Garcia, and that said copy is "now in the hands of Salvador Cardenas." If that is correct, that copy was certainly not the one filed with the petition, and afterwards adduced in evidence before the court on the trial.

Such points only will be adverted to as are deemed material. The first one is, that the State, by her counsel moved to dismiss the case, because the plaintiffs had not filed with the petition such a title, or evidence of right, as was required by the statute. This was correctly overruled by the court, because the documents filed, though not the original title, were sufficient to fully inform counsel for the State of the character of title and the plaintiffs' claim to it; and it can

hardly be considered as consistent with the just and liberal intention of the Government of Texas in passing this law, to debar a party from bringing such a suit, who, from misfortune, or other cause, could not produce the original title or part of it, but who could establish its validity by competent evidence. (Paschal's Dig., art. 7068.)

Objections were taken, however, to the mode adopted of proving the title, and to testimony of the witnesses, on the trial of the case, of a much more serious character, which bring in review the competency and sufficiency of the evidence adduced to establish a perfect title, as claimed for it by the plaintiffs.

Had the document filed been an original testimonio of a Spanish grant of the date of 1798, it otherwise contains all of the requisites of a perfect title, under the laws of Spain relating to the Indies, of that date; and with some proper evidence of its genuineness, as has always been required by the decisions of this court, it would have been admissible in evidence, in support of plaintiffs' claim, not as a composition, but as an absolute and original sale, in fee simple, of the lands of the Crown, having been approved by the Council of the Exchequer, in Mexico, and the grant having been extended by the intendant of San Luis Potosi, and having passed through all the formalities required in such grants. (See White's Recop., sec. 81, marg. p. 57, and preceding royal orders, which are not dated in White, but which, it is believed, should bear date in 1786, the time when the intendancies were established for the granting of lands; Id., marg. p. 54; Andrews v. Marshall, 26 Tex., 215; Titus v. Kimbro, 8 Tex., 210; Word v. McKinney, 25 Tex., 258.)

Being a copy of the original papers of a title, the third time copied, one after and from the other, the question is, was it so proved on the trial as to admit it in evidence, and to be, as proved, considered competent and sufficient evidence to establish the title? It is to be noticed that it lacks the last official act which is usually found in a testimonio, which is,

the certificate of the alcalde of Reynosa, that the instrument delivered to the interested party, at the date of its completion, is a correct copy of the protocol or original title remaining in his office. It is not even a second copy, certified to at a subsequent time, by another alcalde, as being taken from the original in his office. But, from the appended certificate, it would appear that Cardenas presented to Garcia, the alcalde of Reynosa, the original title papers that had been delivered to Balli by the lieutenant, and the annexed transfer made before Cano, in 1829, that he, Cardenas, had in his own possession, and procured him to have it copied and certified to as a correct copy, not of the protocol in his office, but of the original papers constituting the title in the hands of Cardenas. It is not perceived how such a certificate could give any legal authenticity to a copy thus certified to, as it would not appear therefrom that the original was an archive in his office, or in anywise under his control. It would be the same as if one now owning a deed should get it copied and certified to by a clerk or keeper of records, without having the deed recorded, or without its being certified to be a deed recorded in his office. It would require a special enactment, out of the ordinary course of authenticating instruments by the keepers of public records, to give such a certificate any weight as evidence whatever. And the same may be said of the certificate of Miller to the copy. The proof of the handwriting of Garcia and his witnesses, and of Miller, and the capacities in which they acted, which, in fact, was not made on the trial, in and of itself, amounted to nothing, in the absence of a law authorizing them to make such certificates. The recording in Hidalgo county, and the certificate by Rutledge, the county clerk, was equally inefficacious, because it was not proved up for record, even had it been a testimonio, and much less being such a copy of a copy, as shown upon its face. (Lambert *v.* Weir, 27 Tex., 364; Herndon *v.* Casiano, 7 Tex., 333.) In a case in the Supreme Court of the United States, wherein a copy of a copy was allowed to be given in evidence, in the

establishment of a Spanish grant, the copies were certified to by persons who were legally authorized to give out and authenticate the copies respectively, each one being the custodian of the instrument, as an archive of his office, at the time it was so copied and certified to. (United States v. Delespine's Heirs et al., 12 Pet., 654.) Generally, it is the fact that it is a record or archive of an office that makes a copy certified to by the legal custodian of such record or archive stand in the place of the original, where it is shown to be lost, or cannot be produced. (Dikes v. Miller, 25 Tex. Supp., 290; Mapes v. Leal's Heirs, 27 Tex., 349.)

Plaintiffs attempted to prove the loss of the testimonio, and a copy of it by Caravajal. It is evident, however, that the paper that he regarded and spoke of as the testimonio, was the Garcia copy of the testimonio, made in 1849, and that, and not the original testimonio, issued in 1798, was delivered to Miller, and said to have been lost; and therefore, if sufficient proof of search and loss had been made, which could hardly be said in this case, and Caravajal had examined and compared the Miller copy with that which was given to Miller, which he did not do, it would still only be proof of a copy of the copy that Garcia made. Had the Garcia copy been, in fact, the original testimonio, it might have been competent to prove that the Miller copy was a correct copy of it, with such other proof as was necessary to establish the genuineness of the original, without resorting to the proof of the protocol in the archives of Reynosa, if it is there, the testimonio being lost. (Lewis v. San Antonio, 7 Tex., 316.)

Plaintiffs also attempted to prove this title by an " examined or sworn copy" of the protocol in the archives of Reynosa. That, they failed to do with reasonable certainty. The witness, Caravajal, in speaking of the Rutledge copy of the Miller copy, which was before him when he was giving his testimony, being the same that was filed with the petition, says, that " in 1855 or in 1857 he went with Robert H. Hord and Jesus and José Maria Cardenas to the jurgado of Rey-

nosa, and was satisfied by the alcalde and secretary that the copies of titles and sale of San Salvador del Tule were true and correct testimonios, and that the original protocol existed in the archives of Reynosa." He must have been here referring to the Miller copy, as that which he had previously spoken of as the original testimonio had been given to Miller in 1851, unless he referred to an original testimonio then in the hands of the Cardenas, which Garcia had copied in 1849, which was not produced or accounted for on the trial. When he speaks of having often seen the original title in and before 1851, he evidently refers to the Garcia copy made in 1849; and if he means that he had seen the original papers that Garcia copied, he does not state that he ever compared them with the Garcia copy or any other copy, nor does he state that he compared the Garcia copy with the Miller copy, or that with the Rutledge copy that was before him when he gave his testimony. Furthermore, it could not well be inferred from this evidence, that he had personally compared the Miller copy that was in evidence with the protocol in the archives of the jurgado of Reynosa, so as to entitle it to be received in evidence as an examined or sworn copy of the original protocol. He does not say that he ever saw or read the protocol in Reynosa or at any other place.

The same defects in proof apply to the transfer of the sixty leagues (and a fraction) from Aneros to Trute de Cardenas. The proof of that is even more unsatisfactory, because it is not shown how Aneros was or could be the general attorney of his deceased wife, Trevino, in making the sale; and there was no evidence of any such judgment or other judicial proceeding, as was assumed in the instrument itself, to be the foundation of and authority for the sale, as the property of the estate of the grantee, Don Juan José Balli, to satisfy a debt due Mrs. Manuella Montemeyor. Nor was there any allegation in the petition or proof on the trial that there existed in the State of Tamaulipas any law which made such a transfer by itself, even as between proper parties,

acting in their own behalf, evidence of a judicial sale, contrary to well-established rules of law in this State. It has been held that "proofs are made in our courts conformably to the common-law rules of evidence. These, being the law of the forum, must in general govern." (Herndon *v.* Casiano, 7 Tex., 332.) It is evident, then, that the title was not established by any of the modes of proof adopted by the plaintiffs that have been referred to.

The petition alleges that the testimonio was lost, and it is stated by the witness that the protocol exists in the archives of Reynosa, in Tamaulipas, Mexico. If these facts are as alleged and stated, they must have been well known to the plaintiffs before the institution of this suit, and an examined or sworn copy could easily have been produced, or a second copy, certified by the keeper of the archives, where the protocol is, which, with such proof as might have been necessary to establish the genuineness of the original title, might have been produced; and the same may be said of the transfer from Aneros to Cardenas. (Smith *v.* Townsend, Dallam, 570; Paschal *v.* Perez, 7 Tex., 348.)

It is said by Chief Justice Marshall, in the case of Church *v.* Hubbart, that "foreign judgments are authenticated by, 1st, an exemplification under the great seal; 2d, a copy proved to be a true copy; 3d, the certificate of an officer authorized by law, which certificate must itself be properly authenticated. These are the usual, and appear to be the most proper, if not the only, modes of verifying foreign judgments. If they be all beyond the reach of the party, other testimony inferior in its nature might be received. But it does not appear that there was any insuperable impediment to the use of either of these modes, and the court cannot presume such impediment to have existed." (2 Cranch, 176.)

It is true, by the uniform decisions of this court, when a testimonio which is an original copy issued contemporaneously with the making of the protocol, and is the evidence of title

given to the grantee, is offered in evidence, it is required to be accompanied with some evidence of its genuineness, from which it might follow that a second copy, issued and certified to at a later date by the keeper of the archives, or a sworn copy from the original archives, might likewise be accompanied with some such confirmatory evidence of the genuineness of the grant, the exact amount or character of which has not been laid down by our decisions, but must, from the very nature of the case, be left to be determined as the cases requiring it may be presented. (Paschal v. Perez, 7 Tex., 359; Word v. McKinney, 25 Tex., 268, 269; Smith v. Townsend, Dallam, 572; Owings v. Hull, 9 Pet., 625.)

The objections taken to the title, and other evidence of the plaintiffs, need not be noticed in detail, as they embrace all of the defects that have been referred to, and many more, which are enumerated and saved by bills of exception, contained in the record. One of them is, that Noah Cox, who was appointed to take the depositions of the witnesses by agreement of counsel, put down the answers of Mexicans in English, thereby becoming an interpreter, without having been sworn as such. To which it may be answered, that he was sworn faithfully to perform his duty under the commission; and the agreement for him to be appointed, expressly provided for the answers of the witnesses to be written in English. Had the objection been made to the depositions upon the ground that Noah Cox was not an officer authorized by law to take depositions, and that therefore the court could not authorize him to do it, though it was agreed to by the counsel, it might have been difficult to find a satisfactory answer to the objection.

The answers of the witnesses, stating that there was an original protocol, and a record of the judicial proceeding relating to the sale of the land, in the office of the alcalde at Reynosa, were objected to. It is certainly not generally competent to prove a record that is still in existence by oral testimony, and no reason is seen why this should be an ex-

ception to the general rule. It might be proved as an incidental fact, under some circumstances; but certainly not as a means of establishing a title of record, in lieu of the ordinary modes of proving records.

It may be proper to notice that the judgment is in favor of the plaintiffs, for the whole tract, seventy-one and a fraction leagues of land, whereas the petition claims only sixty and a fraction leagues. Neither the petition nor the proof shows the locality of nine of the leagues, and very indefinitely, that of the other two of the eleven leagues not claimed by the plaintiffs. It is not reasonable that the law contemplated the issuing a patent for the whole of any large tract of land for more than was claimed, and shown by the proof to belong to some one who had a right to sue for it; nor to grant a patent at all until there was a legal survey of that part of the tract which was distinctly set out, sued for, and recovered. Without some specific designation of the part of the tract that was recovered, in the judgment of affirmance, when only part of the tract was recovered, the surveyor would have no legal direction in making a survey, preparatory to the issuance of the patent, as required by the law authorizing the suit. (Paschal's Dig., art. 7075.) The eleven leagues not sued for might revert to the State as public domain, and should not therefore be patented to "the original grantee, his heirs and legal assigns." (Paschal's Dig., art. 7074.)

As to persons who may have locations or patents upon the same land prior to the institution of this suit, the law provides for the preservation of their legal rights, by excepting them from the operation of the patent that may be issued for the old grant in this suit, and therefore it may not be important to designate their claims in this proceeding.

It may be worthy of attention that plaintiffs' own witnesses prove, without objection on their part, that Mrs. Manuella Montemeyor, for whose benefit Trute de Cardenas is said to have bought the land, left a will, and that her estate

was distributed under it, and still the plaintiffs claim title simply as her heirs, or rather as the descendants of her heirs.

In considering the competency and sufficiency of the evidence to establish this title, it is proper to embrace the proof of possession adduced on the trial. Upon this subject, it may be remarked that it is the obvious intent of this law, which authorizes this suit, to benefit the parties interested by a confirmation of grants, either perfected or commenced, and progressed with to an extent that would reasonably have insured its consummation, had there been no change of Government, and not to make a new grant; otherwise it might have been obnoxious to the exception taken to the petition by the counsel for the State—that it was in violation of the Constitution of the State, then existing, which provided that "the Legislature shall not hereafter grant lands to any person or persons, nor shall any certificates for land be sold at the land office, except to actual settlers upon the same, and in lots not exceeding 160 acres." (Sec. 6, art. 10, Const. 1869.) It, at any rate, would have been in violation of the long-settled policy of the State, in respect to the amount granted, and the consideration for which it is made; for the State has never expressly stipulated for the making of a grant in consideration of possession, except to pre-emptors, in small quantities. To such considerations may be added the fact, that in the law authorizing this suit for confirmation it was required that the title, or the evidences of the title, or right claimed should be filed with the petition. (Paschal's Dig., art. 7068.) This was to be the case, whether the title was perfect or imperfect.

The evidences of a right by prescription, under the Spanish law, must have consisted for the most part of the evidence of witnesses, which could only have been presented in the shape of affidavits; and had that been contemplated as the evidences of right or title to be filed with the petition, it is reasonable that it would have been indicated by other terms than those used in the statute. Furthermore, the act authorized such

person only to bring this suit, as was " the grantee, heir, or legal assignee of any grant of land emanating from the Spanish or Mexican Governments, and having its origin previous to the 19th of December, 1836." This language would ordinarily import a paper title of some sort that was capable of being filed in court with the petition, whether it was perfect or imperfect, according to the laws and customs under which grants of land (were handed out or) emanated.

The possession of this tract of land, by those claiming to be the owners of it, was proved with as much certainty as could now be expected, from 1798 to 1836, and from 1850 to the time of the trial, excepting a period during the late civil war. Such proof, though it may not be, in this proceeding, under the law authorizing this suit, an independent and sufficient ground for confirming the title, still it is, or may be, very important evidence in support of the good faith of the claim, and of the genuineness of any title emanating from the Spanish Government that may be properly produced. (Lewis *v.* San Antonio, 7 Tex., 302.) From forty years' possession, a right, as against the Government, might have accrued under the Spanish and Mexican Governments, under which the party in possession might defend his right to the land by prescription, as against a subsequent grantee of the same land. (Id., 311; White's Recop., 1 vol., 95.) If plaintiffs have such a right, they can rest and rely upon it. It does not follow from that, however, that the State of Texas proposes, by the enactment of the law authorizing this suit, to be put into affirmative action in making a grant, and in issuing a patent as evidence of it, to authoritatively protect such a claim of right. We do not so understand the law. Because, then, the proof admitted and excepted to was not competent and sufficient to establish the title, under the law authorizing this suit, as claimed by the plaintiffs, the judgment is reversed and the cause remanded.

REVERSED AND REMANDED.